IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIRST GENERAL CONSTRUCTION  :       CIVIL ACTION
CORP., INC.                 :
                            :
        v.                  :
                            :
KASCO CONSTRUCTION CO., INC. :      NO. 10-2655

MEMORANDUM

Dalzell, J.                                    May 24, 2011

        Plaintiff First General Construction Corp., Inc.
("FGCC"), here sues Kasco Construction Co., Inc. ("Kasco") for
breach of contract (Count I), quantum meruit (Count II), unjust
enrichment (Count III), and failure to promptly pay
subcontractor/breach of statutory obligations under the New
Jersey Prompt Payment Act ("NJPPA") (Count IV).

        FGCC filed its complaint on June 3, 2010 and Kasco
answered and counterclaimed.  The parties agreed to go to
arbitration, but before the arbitration could take place Kasco
filed this motion for summary judgment and asked us to stay the
arbitration pending our disposition of its motion.

        Kasco moves for summary judgment on all counts of the
complaint.  For the reasons we discuss in detail below, we will
grant defendant's motion and direct a prompt arbitration on
Kasco's counterclaims.[1]

_____

[1] We have diversity jurisdiction as plaintiff is a New Jersey
corporation based in that state, and defendant is incorporated in

## I.   Factual Background

Kasco contracted with Vornado Realty Trust ("Vornado") to act as Vornado's general contractor in connection with the expansion of the Marlton Shopping Center located at Routes 70 & 73 in Marlton, New Jersey (the "Project").  Kasco's Motion for Summary Judgment ("MSJ"), Ex. A ¶ 3; Ex. C.  On January 8, 2008,[2] FGCC entered into a sub-contract with Kasco to perform all of the concrete work on the Project (the "Contract").  MSJ, Ex. C. Pursuant to the Contract, Kasco agreed to pay FGCC $840,000 for the work. Id.

During the course of the Project, Frank Coogan, Kasco's Project Manager, approved and denied various Change Proposal Requests ("CPRs") FGCC submitted for changes in the scope of its work and the corresponding cost impacts to the Contract.  Id., Ex. A ¶ 7.  Kasco claims that the total amount of the CPRs increased the value of FGCC's work by $85,247.57.  Id. ¶ 10. FGCC claims that, although the terms of the Contract provided that changes relating to extra work could only be made in writing, those terms were waived when Kasco orally approved FGCC

_____

Pennsylvania and based in the Commonwealth.  As will be seen, the amount in controversy exceeds the jurisdictional threshold.

[2] FGCC disputes this date, but whether the parties signed the Contract on January 8, 2008, or some date shortly after February 6, 2008 (as FGCC contends), is not material to this matter.

2

to do certain extra work.  Pl. Resp. at 6.  FGCC claims that it performed various extra tasks outside the scope of the Contract at the verbal direction of Paul Gallagher, Kasco's Project Superintendent.  Id.  In November of 2008, FGCC submitted claims for the extra work that it alleges it completed months earlier. Kasco alleges that these claims were beyond the scope of the Contract and the CPRs.  MSJ, Ex. A ¶ 14.  FGCC claims that Kasco owes it an additional $244,775.12 for the work.  Compl. ¶ 15.

Kasco countersued, averring that FGCC failed to submit invoices for any alleged "extra work" that deprived Kasco of the ability to get paid for that extra work from the Project's owner. Kasco Counterclaim ¶ 8.  Kasco claims that FGCC did not perform some of the work that it said it would perform and that this failure forced Kasco to incur further expenses on the Project. Id. ¶¶ 10-13.

## II.  **Analysis**[3]

---

[3]  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Whenever a factual issue arises which cannot be resolved without a credibility determination, the Court must credit the non-moving party's evidence over that presented by the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing

Kasco moves for summary judgment against FGCC on all counts of FGCC's complaint. Kasco argues that (1) Pennsylvania law governs all of FGCC's claims, (2) the releases FGCC executed bar most of its claims and reduce the amount of damages to $69,583.23, (3) FGCC's failure to obtain Kasco's written authorization for FGCC's alleged extra work bars its claims, and those claims are barred by FGCC's failure to comply with the Contract's notice provisions and its failure to submit back-up information for its claims, (4) FGCC's claims of _quantum_ _meruit_ and unjust enrichment are barred by the existence of a written contract, and (5) the NJPPA bars FGCC's claim for breach of the statutory obligation under the statute's own terms.

A.    **Pennsylvania Law**

---

there is a genuine issue for trial.'" <u>Id.</u> at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982). It is not enough to discredit the moving party's evidence, the non-moving party is also required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257. A proper motion for summary judgment will not be defeated by merely colorable evidence or evidence that is not significantly probative. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50. "[T]he burden on the moving party may be discharged by 'showing'...that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

4

Kasco argues that Pennsylvania law governs all of FGCC's claims. A District Court exercising diversity jurisdiction must of course apply the choice of law rules of the forum state to determine which state's laws govern the substantive issues of the case. Klaxon Co. v. Stentor Elevator Mfg. Co., 313 U.S. 487, 496 (1941); Shields v. Consol. Rail Corp., 810 F.2d 397, 399 (3d Cir. 1987). Pursuant to Pennsylvania law, we will follow the choice of law provision the parties agreed to in the Contract. Gay v. CreditInform, 511 F.3d 369, 389 (3d Cir. 2007) (holding that Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them).

Here, the parties agreed that the Contract "shall be deemed to be entered into in the Commonwealth of Pennsylvania, and the interpretation thereof shall be governed by the laws of the Commonwealth of Pennsylvania without regard to its conflict of laws provisions." MSJ, Ex. C. at 3. FGCC concedes that Pennsylvania law governs the interpretation of the Contract, but argues that the NJPPA, N.J.S.A. 2A:30A-1, et seq., applies to Kasco's alleged failure to pay FGCC for its extra work claims. Pl. Resp. at 11. Kasco contends that the NJPPA cannot apply because (1) FGCC brought this action in Pennsylvania, not in New Jersey, and (2) it is undisputed that Kasco has not received

payment for FGCC's alleged extra work from the Project's owner, Vornado.

The NJPPA provides that "[i]n any civil action brought to collect payments pursuant to this section, the action shall be conducted inside of this State. . . ." N.J.S.A. § 2A:30A-2f. FGCC argues that because the Contract's choice of law provision dictates that "[a]ny dispute under this Contract. . . must be brought in this state or federal courts having jurisdiction in the Commonwealth of Pennsylvania," MSJ, Ex. C at 3, the Contract is in conflict with the statute and therefore the Contract must "yield" to the statute. That is incorrect. When FGCC agreed to this provision of the Contract, it waived its right to bring an NJPPA claim. The terms of the NJPPA are unequivocal. Because FGCC filed this suit in Pennsylvania, as it agreed to do in the Contract, its claim for relief under the NJPPA must fail as a matter of law. Thus, we will grant Kasco's motion for summary judgment on FGCC's fourth claim, and interpret the Contract according to Pennsylvania law as the parties had agreed in the Contract's choice of law provision.

### B. Unjust Enrichment and Quantum Meruit

We next address Kasco's challenges to FGCC's unjust enrichment and quantum meruit claims. Kasco argues that the

6

existence of a written contract between the parties bars these
claims.

Under Pennsylvania law, "where an express contract
governs the relationship of the parties, a party's recovery is
limited to the measure provided in the express contract; and
where the contract fixes the value of the services involved,
there can be no recovery under a quantum meruit theory."
Constar, Inc. v. Nat'l Distrib. Centers, Inc., 101 F. Supp. 2d
319, 324 (E.D. Pa. 2000) (internal quotation marks omitted)
(summarizing Pennsylvania law).

FGCC argues that where extra work was approved
verbally, performed, and then accepted, a party may recover under
a quantum meruit, construction-specific theory, which is an
exception to the general rule that the existence of an express
contract precludes recovery under alternative theories.  Pl.
Resp. at 27.  FGCC cites U.S. to Use of Viglione v. Klefstad
Engineering Co., 324 F. Supp. 972, 975 (W.D. Pa. 1971), and
Universal Builders, Inc. v. Moon Motor Lodge, Inc., 244 A.2d 10
(Pa. 1968), in support of its argument.

Viglione involved a cause of action under the Miller
Act and did not contain alternative counts of breach of contract,
quantum meruit or unjust enrichment.  The contractor in Viglione
sent a surveyor to measure quantities of excavated material so

7

its subcontractor could bill the contractor for the actual
quantity of material excavated.  324 F. Supp. at 974.  The
surveyor's records were destroyed before they were given to the
subcontractor to bill the contractor.  Id.  The Court held that
the destruction of the surveyor's records should not defeat
plaintiff's right to recover, and thus this conduct waived the
contract's requirement that there be documentation of the amount
of excavated material.  Id. at 975.  FGCC does not claim that its
documents were destroyed, but rather that the agreement was oral.
Thus, Viglione is distinguishable.

        In Universal Builders, upon which the Viglione court
relied, the Pennsylvania Supreme Court refused to enforce a
contract provision allowing extra work to be completed pursuant
only to a written, signed change order because the owner had (1)
requested the extra work, (2) promised to pay for it, and then
(3) watched it being performed, knowing that the extra work was
not authorized in writing.  244 A.2d at 15-16.  Universal
Builders is directly on point.  Thus, we must determine whether
FGCC has raised a genuine issue of material fact with regard to
whether Frank Coogan, the only person Kasco authorized to approve
any extra work, orally authorized such work, promised to pay for
that work, and then was aware that the work had been done.

Kasco does not dispute that Paul Gallagher, the Project superintendent who was on site, knew that FGCC was performing extra work. Kasco Repl. at 20. But Kasco argues that neither Gallagher nor Coogan knew at the time that FGCC considered the extra work it was doing to be outside the scope of the Contract, nor that FGCC would seek extra compensation for that work. With regard to the rejected CPRs, Coogan testified:

> There is nothing in our daily log of that date indicating it. We never were given a ticket by First General, a time and material ticket saying that they performed the work. No one ever kept time on it. Months and months and months later I was submitted a bill for work that supposedly happened five months before. There is no way to verify that it ever happened, other than this piece of document that Gino produced.

Def. Repl., Ex. 1 ("Coogan Dep.") at 96:21-97:9. Kasco argues that FGCC presented no evidence that anyone ever offered to pay for the disputed extra work at the time it was being done. Def. Repl. at 18. Indeed, FGCC presents evidence that it generally received verbal directives from Gallagher to complete work outside the scope of its contract with Kasco, and that FGCC occasionally received oral directives from Coogan. Pl. Resp. at 27; Id., Ex. G (Deposition of Gino DiBattista, FGCC's President ("DiBattista Dep.")) at 29:17-20, 30:9-13 ("[t]he standard procedure was verbal communication and verbal directives by . . . Paul Gallagher . . . there was significant directives given

9

directly to people by Frank Coogan."); Ex. H (Deposition of Paul

Gallagher ("Gallagher Dep.")) at 24:17-20 (agreeing that he had

issued verbal directives to FGCC to perform work outside the

scope of their Contract).  But FGCC has presented no evidence

that it either received verbal directives from Coogan -- the only

person authorized to approve such work -- to complete the extra

work in dispute here, or that Coogan orally agreed to <u>pay</u> for the

extra work in dispute.

FGCC has not proffered any evidence from which a

reasonable factfinder could conclude that Coogan (1) requested

the extra work, (2) promised to pay for it, and then (3) watched

it being performed, knowing that the extra work was not

authorized in writing.  Thus, FGCC's <u>quantum meruit</u> and unjust

enrichment claims must fail as a matter of law, and we will grant

Kasco's motion for summary judgment on those claims.

### C.    Breach of Contract

We turn now to Kasco's motion for summary judgment on

FGCC's breach of contract claim.  Kasco argues that (1) the

releases FGCC executed bar most of FGCC's claims and reduce the

amount of damages said to be $69,583.23 based on the language in

the releases themselves, and that partial releases and release

agreements in general are given full effect under Pennsylvania

law, and estoppel bars FGCC's claims, and (2) FGCC's claims are

barred by its failure to obtain Kasco's written authorization for the alleged extra work, to comply with the Contract's notice provisions, and to provide backup information for its claims.

1.   **The Releases**

As noted, Kasco contends that the releases FGCC
executed bar most of FGCC's claims and reduce the amount of
damages based on the language in the releases themselves.  Kasco
claims that partial releases and release agreements in general
are given full effect under Pennsylvania law.

FGCC counters that the releases are unenforceable.
FGCC also contends that Kasco waived the requirement that FGCC
obtain written authorization for CPRs, and that Kasco waived the
Contract's notice and backup requirements when it orally approved
extra work.

Under Pennsylvania law, a release is itself a
contract.[4]  <u>Kenneth Hantman, Inc. v. Whiting-Turner Contracting
Co.</u>, No. 07-1574, 2008 WL 4072591, *6 (E.D. Pa. Sept. 2, 2008)
(summarizing Pennsylvania law).  As such, the effect of a release
is determined by the ordinary meaning of its language.  <u>Taylor v.
Solberg</u>, 778 A.2d 664, 667 (Pa. 2001).  If the terms of the

---

[4] This has been the general American rule for quite some time.
<u>See</u>, <u>e.g.</u>, Joel and Ethan Coen, <u>True Grit</u> (Paramount, 2010)
("STONEHILL: "I will pay two hundred dollars to your father's
estate when I have in my hand a letter from your lawyer absolving
me of all liability from the beginning of the world to date." . .
. MATTIE: "I cannot accept that. There can be no settlement after
I leave this office. It will go to law."  STONEHILL: "This is my
last offer.  Two hundred and fifty dollars. For that I get the
release previously discussed and I keep your father's saddle. I
am also writing off a feed and stabling charge. The gray horse is
not yours to sell. You are an unnatural child.").

release are clear and unambiguous, a court should look no further than the release for interpretation, even if the language is broad and general. Id. at 667-68.

DiBattista executed a series of releases over the course of the Project, the last of which was effective through August 31, 2008. MSJ, Ex. H. The releases DiBattista signed provide that the "Subcontractor does hereby irrevocably waive and release the Contractor . . . and Vornado, Inc. (the "Owner") . . . from and against any and all claims and liens. . . ." Id. DiBattista also admitted that he agreed to submit partial releases in order to receive payment under the Contract. Id., Ex. B at 103:4-104:2. Notably, the Contract includes a term that provides, "[u]pon request, the Subcontractor will submit properly executed releases of liens during the progress of the work and before final payment is made." MSJ, Ex. C at 3.

FGCC claims that the releases are unenforceable because they lack consideration. But as Judge Schiller noted in Hantman, "[t]he consideration for the releases is the same as the consideration for [the] Subcontract. Accordingly, no additional or independent consideration is necessary because the parties were careful to include the releases as a term of the contract." Hantman, 2008 WL 4072591 at *7.

In addition, even if the releases were considered separate from the Contract, under Pennsylvania law a written release will not be rendered unenforceable for lack of consideration if the writing also contains an additional express statement that the signer intends to be legally bound. Id. (citing 33 PA Cons. Stat. Ann. § 6 (2008)). Just as in Hantman, FGCC's releases were signed before a notary. The releases also include the statement, "[t]he person signing on behalf of the Subcontractor represents and warrants that he is duly authorized and empowered to sign and execute this waiver on behalf of the Subcontractor. In witness whereof, the Subcontractor has caused this instrument to be executed in its corporate name as of [the date of execution]." MSJ, Ex. H.

FGCC argues that because the Contract only provides for a release of liens, not a release of liens and claims, the release only applies to liens. Pl. Resp. at 13-15. But the Contract refers to the releases, and the releases refer to liens and claims. We therefore find this argument unavailing. Even viewing the facts in the light most favorable to FGCC, a reasonable factfinder could not conclude that the releases are unenforceable nor that FGCC did not intend to be legally bound by them. Because we hold as a matter of law that the releases are enforceable, we need not consider Kasco's promissory estoppel

14

argument.  Thus, FGCC cannot collect on any claims that accrued
before August 31, 2008.

## 2.  **Waiver**

Kasco next argues that FGCC's claims are barred by
FGCC's failure to (1) obtain Kasco's written authorization for
the alleged extra work, (2) comply with the Contract's notice
provisions, and (3) provide backup information for its claims.
FGCC contends that Kasco, by its course of conduct with FGCC
throughout the Project, waived the requirement that it obtain
signed, written authorization for change order work.

At least one court in this district has acknowledged
that contracts requiring written approval may be strictly
enforced.  Allied Fire & Safety Equip. Co., Inc. v. Dick
Enterprises, Inc., 972 F. Supp. 922, 929 (E.D. Pa. 1997) (Joyner,
J.).  But under Pennsylvania law, unless a contract is for a sale
of goods, "[a]n agreement that prohibits non-written modification
may be modified by subsequent oral agreement if the parties'
conduct clearly shows the intent to waive the requirement that
the amendments be made in writing."  Somerset Community Hosp. v.
Mitchell & Assoc., Inc., 685 A.2d 141, 146 (Pa. Super. Ct. 1996);
see also Universal Builders, 244 A.2d at 15.  Universal Builders
noted that courts have frequently held that owners must pay for
extra work done at owners' oral direction.  Universal Builders,

15

244 A.2d at 15. "An oral contract modifying a prior written contract, however, must be proved by clear, precise and convincing evidence." Somerset, 685 A.2d at 146.

In Universal Builders, the Pennsylvania Supreme Court held that the Chancellor had correctly found that the defendant was liable and had to pay for the extra work in spite of the lack of a written change order because the evidence showed that an agent of the defendant had requested many changes, was informed that they would involve extra cost, and promised to pay for them. Universal Builders, 244 A.2d at 15. Thus, we must determine whether an agent of Kasco requested the extra work, was informed that the extra work would involve extra cost, and then promised to pay for it.

FGCC presents evidence that Gallagher told it to perform extra work and Kasco does not dispute this point. But Kasco disputes that it approved this work outside of the process defined in the Contract. Def. Repl. at 17. Kasco admits that sometimes work would begin on a submitted CPR before it had received a change order from Vornado. Coogan testified, "[s]ometimes [FGCC would begin work before we received a change order from the owner] if we had verbal approval from the owner's representative." Def. Repl., Ex. 1 at 65:4-6. Coogan testified that he could not recall an instance where he gave an oral order

16

to proceed with extra work without first signing off on a CPR. Id. at 65:16-66:1. Thus, Kasco contends that FGCC had always submitted a CPR before Kasco gave a verbal order to perform the work.

But DiBattista testified that when changes in the scope of FGCC's work obligations under the Contract had to be made, he would have "numerous conversations with Paul Gallagher requesting acknowledgment that Kasco understood that this was a change condition with increased cost. And in every instance, he affirmed my request stating that everybody knew. And once the cost could be gathered, you know, we would submit." Pl. Resp., Ex. G at 34:14-21. Thus, FGCC has presented evidence that Gallagher, an agent of Kasco, had requested changes, and that Gallagher was in turn informed that they would involve extra cost. FGCC has also presented evidence that Kasco promised to pay for the requested changes before FGCC started the work. DiBattista testified that "[w]e gave them a written cost. They either gave us a verbal and followed up with a signed approval or we never received the signed approval." Id. at 35:22-36:1. Viewing the facts in the light most favorable to the non-moving party, we find that there is a genuine issue of material fact with regard to whether the parties orally modified the Contract.

Respecting notice, the Contract requires that claims be made "in writing to Contractor's offices within ten (10) calendar days of the occurrence of such claim." MSJ, Ex. C at 6. Pennsylvania law takes a more lenient approach to construing notice provisions in construction contracts whereby the spirit of the provision, rather than the strict terms, dictates whether a contractor seeking compensation for a claim or claims complied with the contract's notice provisions. James Corp. v. North Allegheny School Dist., 938 A.2d 474, 486 (Commw. Ct. 2007). But in James Corp., the Commonwealth Court noted that the notice provision may be modified by actual notice only if the defendant suffered no prejudice by the plaintiff's failure to submit a written claim. Id. at 486-87.

Here, FGCC claims that Kasco was not prejudiced by its failure to submit written notice because Kasco accepted final payment from Vornado with the knowledge that FGCC maintained outstanding claims against Kasco. Pl. Resp. at 23. FGCC also argues that Kasco never executed a final release in favor of Vornado. Id. Therefore, FGCC argues, Kasco cannot now claim that it was prejudiced by FGCC's less formal satisfaction of the Contract's notice provision. Id. Kasco claims that it was prejudiced because it could not verify the alleged extra work nor

timely submit the extra work claims to Vornado for payment.  Def.
Repl. at 20.

Although Kasco was understandably annoyed about FGCC's
failure to promptly submit its work claims, Kasco has failed to
submit any evidence showing that it was prejudiced by FGCC's
failure to submit its claims promptly.  In a May 1, 2009 email
from Coogan to DiBattista, after Kasco had asked FGCC to submit
any additional claims within a week (which FGCC failed to do) and
after Kasco had received final payment from Vornado, Coogan
wrote,

> We made it very clear that we were expecting
> final payment from Vornado in about a week
> and it would be very difficult to go back to
> them on any issues that may result from your
> claim.  Since we have now been paid in full I
> am not inclined to jepordaize [sic] our
> relationship with Vornado by trying to go
> back and re-open the job when you did not
> hold up your end of the bargain.

Pl. Resp., Ex. N at 2.  FGCC argues that this does not constitute
a final release and therefore no prejudice befell Kasco.  Id. at
23.  Kasco responds that Coogan testified that Kasco had received
"final payment on the job" and therefore Kasco executed a final
release.  Def. Repl. at 8; Ex. 1 at 151:9-10.  But Coogan also
testified that he had never seen a form of final release on this
Project that Kasco executed, and that he did not know if one was
ever executed.  Id., Ex. E at 43:10-13.  Thus, viewing the facts

in the light most favorable to FGCC, we find that there is a
genuine issue of material fact as to whether FGCC's failure to
comply with the Contract's notice provisions prejudiced Kasco.

Finally, with regard to the Contract's backup
information provision, the Contract requires that change order
requests "include back-up information referencing plan numbers
with dates, detail numbers, specification sections and include
quantity take-offs and a breakdown of labor and material costs."
MSJ, Ex. C at 6. The Contract also requires that "[a]ny work
provided on a 'Time and Material' (T&M) basis shall be evidenced
by work tickets presented daily to Contractor's field supervisor
for acknowledgment. No invoices will be processed without daily-
signed tickets." Id. Kasco argues that FGCC failed to comply
with this provision. MSJ at 25. FGCC responds that the parties,
through their conduct, modified the Contract's backup information
provision, and even if they did not, FGCC provided backup
documentation to its claims that complied with the terms of the
Contract. Pl. Resp. at 24.

In Allied Fire, Judge Joyner upheld the provision in
the construction contract requiring the submission of backup
documentation for change orders. Allied Fire, 972 F. Supp. at
929. Judge Joyner further noted that the purpose of a provision
requiring backup information is to ensure that the contractor has

20

all the relevant information it needs to assess the subcontractor's entitlement to additional funds.  Id.  Judge Joyner declined to rule on whether the backup information provision was enforceable.  There, a genuine dispute of material fact remained as to whether the subcontractor had failed to submit the backup information because it had not received certain requested documents from the contractor (i.e., it was the contractor's fault).

Here, FGCC presents evidence that it supplied the same backup information for certain claims that Kasco paid as it did for the claims that Kasco now disputes -- namely, a single page memorializing the date the work was performed, a description of the work and the amount for the proposed change, and a second page with an itemized breakdown of the labor and materials needed (or to be supplied) to perform the work.  Pl. Resp., Ex. K.  FGCC argues that Kasco paid it for change order work that included the type of backup that Kasco now argues is unacceptable under the terms of the Contract.  Id. at 25.

Kasco responds that although Coogan authorized certain change orders without written documentation, this did not constitute a waiver because he was able to verify the claims with Gallagher and approve what was submitted or negotiate a revised amount with DiBattista.  Def. Repl. at 20-21.

We agree with Judge Joyner's assessment in <u>Allied Fire</u>
that the purpose of the backup documentation is to ensure that
the contractor has all the relevant information it needs to
assess the subcontractor's entitlement to additional funds.  With
regard to the disputed CPRs, Kasco asserts that it cannot at this
late date verify that FGCC actually did the work for which it
claims damages.

FGCC counters that it did comply with the Contract when
it submitted its CPRs.  FGCC contends that the CPRs contain (1)
the date, (2) a description of the work, and, in some cases, the
Kasco agent who directed the work, (3) the price of the extra
work, and (4) a breakdown of the labor and materials necessary to
perform the extra work.  Pl. Resp., Ex. K.  Kasco presents
evidence, in the form of Coogan's deposition testimony, that (1)
there was nothing in Kasco's daily log about the work, (2) FGCC
never gave Kasco a time and material ticket saying that it
performed the work, and (3) no one ever kept time on the work.
Def. Repl. at 21; Ex. 1 at 96:18-97:11.  FGCC does not present
any evidence of daily work tickets; indeed, it admits that it has
none and submitted only the CPRs.

Without an independent method of verifying that the
work was completed, Kasco cannot assess whether FGCC is entitled
to additional funds.  Thus, with no additional evidence that the

work was done besides the CPRs FGCC submitted five months after it allegedly completed the work, we hold that FGCC did not comply with the Contract's backup information provision. Nor can we on this record conclude that the Contract was modified as a matter of law because Kasco presents evidence that, in instances where FGCC did not submit a daily T&M ticket, Gallagher was on hand to verify independently that the work was done. Thus, on this record we hold as a matter of law that Kasco is entitled to summary judgment on FGCC's breach of contract claim.

## III. <u>Conclusion</u>

We stayed the parties' scheduled arbitration at their request so that we could dispose of Kasco's motion for summary judgment as to plaintiff's claims. For the reasons just stated, we will grant Kasco's motion for summary judgment on all the counts of plaintiff's complaint and order the Arbitration Clerk to schedule this case for a prompt arbitration on Kasco's counterclaims.

BY THE COURT:

\_\_\s\Stewart Dalzell